# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**BOBBY L. TATE,**
        **Petitioner,**

    **v.**                                         **Case No. 15-C-1469**

**WILLIAM POLLARD,**
        **Respondent.**

---

## DECISION AND ORDER

Bobby L. Tate petitions for a writ of habeas corpus under 28 U.S.C. § 2254. He alleges three claims of ineffective assistance of appellate counsel. Two of those claims relate to counsel's failure to raise Fourth Amendment issues arising out of the tracking of his cell phone and the police's entering an apartment in which both he and evidence of his crimes were found. The remaining claim alleges that appellate counsel was ineffective in failing to challenge trial counsel's failure to raise an issue involving Tate's plea of no contest.

## I. BACKGROUND

On the evening of June 9, 2009, officers of the Milwaukee Police Department responded to a shooting outside of a store called Mother's Foods Market/Magic Cell Phones. One victim had been shot dead, and a second had been shot in the ankle and taken to a hospital. Witnesses described the shooter as a black male wearing a striped polo shirt. The store's surveillance camera footage showed a person wearing a striped polo shirt purchase a cellular telephone from inside the store, walk outside, and shoot the victim in the back of the head. The clerk who sold the phone to the suspect told the police that the suspect had identified himself as "Bobby."

Mother's Foods provided the police with information about the phone that the suspect had purchased, including the telephone number assigned to the phone. The police used the number to identify the phone's service provider. Officers then prepared an affidavit for a court order allowing them to obtain information that would assist them in tracking the phone's location. The police described the details of the shooting in the affidavit and explained that tracking the location of the phone would "reveal evidence of the crime of First Degree Intentional Homicide." (ECF No. 16-2 at 3.) Based on this information, a judge of the Milwaukee County Circuit Court entered an order allowing the police to obtain information from the service provider and to identify the physical location of the phone. *See State v. Tate*, 357 Wis. 2d 172, 180 n.6 (2014).

Using information provided by the service provider and a device known as a "stingray," the police narrowed the phone's location down to a particular area within a large apartment building. *Id.* at 182–83. Shortly after midnight, several police officers entered the apartment building and began knocking on the doors of the apartments within the target area. The officers spoke with several residents before arriving at an apartment rented by Tate's mother, Doris Cobb.

According to testimony received at a later suppression hearing, at least three officers arrived at Cobb's door: Officer Eric Dillman, Officer Jason Enk, and Officer Angela Juarez. Upon arriving at the apartment, Officer Dillman knocked on the door, and Doris Cobb answered. Dillman testified that, when Cobb answered the door, he told her that the police had reason to believe that a suspect who had recently committed a serious crime was inside the apartment complex. He asked her if the police could enter her apartment and search for this person. According to Dillman, Cobb was "cooperative" and

2

said "come on in." (ECF No. 16-15 at 25 of 106.) He testified that the officers who were with him entered the apartment after he did. (*Id.* at 26 of 106.) Dillman stayed in the living room area of the apartment while the other officers performed the search.

Officer Enk also testified at the suppression hearing. According to his testimony, he was about ten feet away from Dillman when Dillman knocked on Cobb's door. Enk could not hear everything that was said, but he testified that, when the door was opened, Dillman asked if he could come in, and he saw Dillman enter the apartment. Enk testified that, when he saw Dillman enter, he assumed that the occupant had consented to a search. Enk then entered the apartment and began searching.

Officer Juarez also testified at the suppression hearing. She testified that she was in the hallway when Dillman knocked on the door of Cobb's apartment. She testified that she could not hear Dillman's conversation with Cobb, but she observed him speaking with the person who had answered the door. On cross-examination, Tate's counsel asked Juarez the following question: "And he's [Dillman's] talking to the lady at the door outside the door? In the door? Where was he talking to her?" (ECF No. 16-15 at 54 of 106.) Juarez answered, "Where a normal person would be talking to somebody like in the threshold, I believe." (*Id.*) Juarez testified that she was not paying attention to Dillman's conversation with Cobb and therefore did not hear Cobb consent to a search. However, once Dillman went inside, Juarez followed and began searching.

The defense called Cobb to testify at the hearing. She testified that, when the police knocked on her door, another occupant of the apartment woke her up and told her that police officers were outside. Cobb testified that she got up to answer the door, and that when she did so, the police told her that they were looking for "Bobby" and

3

immediately entered the apartment. Cobb also testified that the police asked her if Bobby was there, that she said that he was, and that she pointed at the room he was in. Cobb testified that she did not give the officers consent to enter the apartment and that, after she opened the door, the officers "just came in." (ECF No. 16-15 at 66 of 106.)

After the officers entered the apartment, some went to a back bedroom, where they found Tate and a woman in bed. The officers asked Tate if his name was Bobby, and he said yes. The officers saw a striped shirt in the bedroom in plain sight, along with a bloody shoe. The officers placed Tate in handcuffs and waited for detectives to arrive. Once the detectives arrived, Tate was arrested, and the striped shirt and the bloody shoe were seized.

Following his arrest, Tate was charged with first-degree intentional homicide, second-degree reckless injury, and possession of a firearm by a felon. Eventually, Tate's appointed attorney, Richard Hart, Jr., filed a motion to suppress the evidence recovered from the apartment and other evidence regarded as fruits of the search on the ground that the search violated the Fourth Amendment and state law. Hart argued that officers needed a search warrant to track Tate's phone and that the order that the police had obtained was not the equivalent of a search warrant. He also argued that Cobb's testimony was more credible than the officers' on the question of whether consent was obtained before the police entered the apartment, and that therefore the search could not be justified based on consent. The trial court denied the motion to suppress, concluding that the order was sufficient to allow law enforcement to track Tate's phone to the apartment building, that Cobb's consent justified the search of the apartment, that the police had probable cause to arrest Tate once he identified himself as Bobby and the

4

officers saw the shirt in plain view, and that the shirt and the shoe were properly seized after they were found in plain view.

After the court denied the motion to suppress, the state and Tate entered into a plea agreement. Under the agreement, the charge of first-degree intentional homicide was reduced to first-degree reckless homicide and the charge of second-degree reckless injury was dismissed. Tate agreed to plead no contest to the reckless-homicide charge and the charge of possession of a firearm by a felon. At a plea hearing that occurred on May 13, 2011, Tate was represented by the same appointed attorney who represented him at the suppression hearing, Richard Hart, Jr. Once the parties indicated that Tate intended to enter a plea of no contest, the judge engaged Tate in a lengthy plea colloquy. As part of the colloquy, the following exchange took place:

> THE COURT: Has anyone including your lawyer made any threats or in any way forced you to plead no contest to the charges?
>
> THE DEFENDANT: No.
>
> THE COURT: Other than the plea negotiations in this matter, has anyone made any promises to you?
>
> THE DEFENDANT: No.
>
> THE COURT: To get you to plead no contest to the charges?
>
> THE DEFENDANT: No.
>
> THE COURT: Are you entering these pleas freely, voluntarily, and intelligently with full understanding?
>
> THE DEFENDANT: Yes.

(ECF No. 16-16 at 10.) The trial court accepted Tate's pleas of no contest and later sentenced him to a total of 43 years of initial confinement and 14 years of extended supervision.

Following his conviction and sentencing, Tate was represented by Attorney Byron Lichstein on direct appeal. Lichstein was affiliated with the Frank J. Remington Center, a clinical program of the University of Wisconsin Law School. Lichstein filed a brief in the Wisconsin Court of Appeals arguing that, for several reasons, the police violated the Fourth Amendment and state law by tracking Tate's phone. First, Lichstein argued that the Wisconsin Statutes did not authorize a judge to issue an order to track a cellular telephone. Second, he argued that tracking the phone was a "search" within the meaning of the Fourth Amendment and that the order the police had obtained did not satisfy the Fourth Amendment's requirements for a warrant. Here, Lichstein argued that the order failed the Fourth Amendment's particularity requirement for two reasons: (1) it failed to specify actual evidence of a crime and instead described only location information, which was not itself evidence of a crime, and (2) the order "failed to specify a location where evidence would be found." (ECF No. 35 at 12 of 57.) As to the second point, Lichstein argued, in part, as follows:

> The particularity requirement insists on specific evidence of a crime and a specific location. U.S. Supreme Court caselaw is clear that both the specific evidence and the specific location must be stated in the warrant itself, not merely in the supporting documents. The Order here had neither. The only description of the evidence was the generalized "evidence of first degree intentional homicide." The Order did authorize a search for location data, but this was not itself evidence. Nor did the Order identify a location where evidence would be found. This search, in other words, was the kind of broad unspecified "general" search that the particularity requirement was designed to protect against.

(*Id.* at 19–20 of 57 (citations and footnote omitted).) Lichstein did not appeal the trial court's factual determination that Cobb had consented to the search of her apartment.

The Wisconsin Court of Appeals determined that the Fourth Amendment question was dispositive and did not address Lichstein's arguments concerning statutory authority.

6

The court stated that the only issue relevant to the appeal was "whether there was probable cause to believe that location data obtained from Tate's phone would lead to evidence of the crime of homicide described by witnesses and shown on the surveillance videos." (ECF No. 16-2 at 6.) The court concluded that the warrant application contained information from which the judge could conclude that the location data from the phone would probably lead to evidence of the shooting, such as Tate's clothing and the weapon. The court also found that the phone itself was evidence of the crime in that it was evidence of the shooter's identity. (*Id.* at 8.). Finally, the court found that although the warrant did not authorize a broad search of Cobb's apartment, this did not matter because Cobb's consent justified a warrantless search of the apartment. (*Id.* at 8–9.)

The Wisconsin Supreme Court granted Tate's petition for review and affirmed. *See State v. Tate*, 357 Wis. 2d 172 (2014). The court addressed both Lichstein's statutory-authority argument and his Fourth Amendment arguments. Regarding the Fourth Amendment, the court assumed that tracking a cellular telephone using information provided by the service provider and a stingray constitutes a "search." In assessing the search's reasonableness, the court treated the order authorizing the tracking as a warrant, and it examined whether the order satisfied the Fourth Amendment's requirements of probable cause and a particularized description of the place to be searched and the items to be seized. The court determined that probable cause was demonstrated because the evidence that the police had collected at the scene of the crime showed that the phone itself would likely provide evidence of the shooter's identity. *Id.* at 193–94. As to particularity, the court described Lichstein's argument as being that the order was invalid because it did not "specify a particular location where evidence will

7

be found." *Id.* at 195–96. The court held that, in the context of phone tracking, a warrant did not have to identify a particular location but instead could satisfy the particularity requirement by identifying the phone's unique electronic serial number. *Id.* at 196–97. Finally, the court rejected Lichstein's statutory challenges to the tracking order. *Id.* at 197–201.

On December 9, 2015, Tate, proceeding pro se, commenced this action for a writ of habeas corpus under 28 U.S.C. § 2254. However, he immediately moved to stay the action while he sought collateral relief in state court. A judge of this court granted his stay request on January 20, 2016.

Back in state court, Tate first filed a petition for a writ of habeas corpus with the Wisconsin Court of Appeals alleging that he had received ineffective assistance of appellate counsel on direct review. As is relevant here, Tate argued that Lichstein rendered ineffective assistance in two respects: (1) not arguing that the warrant was invalid for failing to specify the person or things to be seized, and (2) not challenging the trial court's factual determination that Cobb had consented to the search of the apartment. In rejecting Tate's habeas petition, the court of appeals applied *Strickland v. Washington*, 466 U.S. 668 (1984). (ECF No. 16-6.) The court understood Tate's first argument as being that Lichstein should have argued that the police unlawfully monitored his phone while it was inside his mother's apartment. The court rejected this argument on the ground that the warrant authorized a search of the information emitted by the phone, no matter where the phone was located at the time, and that therefore counsel did not perform deficiently in failing to raise this claim. As to Tate's second argument, the court found that appellate counsel did not perform deficiently in failing to challenge the trial court's factual finding of

8

consent because (1) factual findings are rarely overturned on appeal and (2) Tate had failed to show that counsel could have made a strong argument that the trial court's finding of consent was clearly erroneous. Tate sought review of the court of appeals' denial of his habeas petition, but the Wisconsin Supreme Court did not accept the discretionary appeal.

Still in state court, Tate filed a postconviction motion in the trial court under Wis. Stat. § 974.06 arguing that his postconviction counsel, Lichstein,[1] was ineffective for not filling a postconviction motion alleging that trial counsel was ineffective in two respects: (1) failing to challenge the search of Cobb's apartment on the ground that Cobb's consent was tainted by the officers' entry into the apartment before consent was obtained, and (2) failing to bring a motion to withdraw Tate's no-contest plea on the ground that the trial court had accepted the plea without complying with certain procedures mandated by state law. The trial court denied the motion, and Tate appealed. The Wisconsin Court of Appeals affirmed. Regarding Tate's argument as to consent, the court determined that it involved the same issue that he had raised in his prior habeas petition, which challenged the performance of appellate counsel, and that therefore he was not entitled to relitigate the issue through the lens of ineffective assistance of postconviction counsel and trial counsel. As to the plea issue, the court addressed it on the merits and concluded that the

---

[1] Under Wisconsin procedure, a criminal defendant may raise certain claims, such as ineffective assistance of trial counsel, in postconviction proceedings in the trial court prior to filing a direct appeal. The attorney representing the defendant in such proceedings is generally referred to as postconviction counsel. *See State ex rel. Rothering v. McCaughtry*, 205 Wis.2d 675 (Ct. App. 1996). In Tate's case, no postconviction motion was filed, but the lawyer who would have been responsible for filing one was Lichstein, who represented Tate on direct review.

9

trial court had complied with all requirements for accepting a plea of no contest and that therefore trial and postconviction counsel could not have been ineffective in failing to argue noncompliance. Tate sought review of the court of appeals' decision by the Wisconsin Supreme Court, but his petition for review was denied.

Having exhausted his claims in state court, Tate returned to federal court and filed an amended petition. (Second Amended Pet., ECF No. 11.) I ordered the respondent to file an answer and set a briefing schedule for deciding the merits of the claims raised in the amended petition. Tate's opening brief raises three claims of ineffective assistance of appellate counsel: (1) Attorney Lichstein failed to adequately challenge the warrant's lack of particularity because he did not argue that the warrant was invalid for failing to specify the things to be seized and the person to be seized; (2) Attorney Lichstein failed to raise a claim of ineffective assistance of trial counsel based on trial counsel's failure to argue that Cobb's consent was tainted by the officers' pre-consent entry into the apartment; and (3) Attorney Lichstein failed to raise a claim of ineffective assistance of trial counsel based on trial counsel's failure to argue that the plea colloquy did not comply with state law. I consider these claims below.[2]

## II. DISCUSSION

For Tate to show that his appellate counsel was ineffective, he must show that Attorney Lichstein's performance was deficient and that this deficiency prejudiced him.

---

[2] The amended petition asserts six "grounds" for relief. Most of those grounds are encompassed by the three issues described in the text. However, to the extent Tate alleged claims in his petition that he has not pursued in his brief, I deem him to have abandoned those claims. In particular, I deem Tate to have abandoned grounds one and two of the Second Amended Petition.

Case 2:15-cv-01469-LA   Filed 05/13/22   Page 10 of 24   Document 48

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). If Lichstein abandoned a nonfrivolous claim that was both "obvious" and "clearly stronger" than the claims that he actually presented, then his performance was deficient, unless his choice had a strategic justification. *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013). Lichstein's deficient performance prejudiced Tate if "there is a reasonable probability that raising the issue would have made a difference in the outcome of the appeal." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000). A defendant whose lawyer does not provide him with effective assistance on direct appeal and who is prejudiced by the deprivation is entitled to a new appeal. *Mason v. Hanks*, 97 F.3d 887, 892 (7th Cir. 1996).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to a habeas petition filed by a person in custody pursuant to a judgment of a state court. *See* 28 U.S.C. § 2254. It contains a deferential standard of review that prevents a federal court from granting the writ with respect to any claim that was adjudicated on the merits in state court unless the petitioner shows that the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States or was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Id.* § 2254(d). In the present case, Tate disputes that the state courts adjudicated his two ineffective-assistance claims premised on the search on the merits, but he concedes that the Wisconsin Court of Appeals decided his ineffective-assistance claim premised on the acceptance of his no-contest plea on the merits. However, Tate contends that because the court did not address the prejudice prong with respect to the plea, I must review that prong de novo. I will not examine whether any part of the

11

Wisconsin Court of Appeals' decisions must be reviewed under § 2254(d) because, as discussed below, even under *de novo* review, Tate is not entitled to habeas relief on any claim.

**A.    Failure to Challenge Lack of Description of Person and Things to be Seized**

Tate first contends that Lichstein performed deficiently by failing to argue that the order authorizing the police to track his phone did not comply with the Fourth Amendment's particularity requirement because it did not adequately specify a person or things to be seized. Tate seems to believe that because the police wished to find both the person that bought the phone and things such as the shirt worn by the person in the surveillance video, the order authorizing the phone-tracking operation had to specifically grant the police permission to search for and seize these items. However, the order that the police obtained was not a warrant for Tate's arrest or a warrant to search an area in which Tate, the shirt, or other physical items might be found. It was, instead, an order allowing the police to collect information about the location of a specific phone. Once the police acquired the location information using the warrant, officers relied on exceptions to the warrant requirement to enter Cobb's apartment, arrest Tate, and seize the shirt and other items. Because the warrant did not authorize the police to search for or seize the person or physical things that the police *hoped* to find using the location data, the warrant did not need to describe that person or those things with particularity. Counsel, of course, wisely omitted this argument from his appellate briefs and therefore did not perform deficiently in doing so.

In a related argument, Tate argues that Lichstein was deficient in failing to argue that the warrant's description of items to be seized—which Tate believes was "evidence

of first degree intentional homicide"—was too general. (ECF No. 34 at 22 of 46.) But the warrant did not allow officers to seize evidence of first-degree intentional homicide in general; it allowed officers to seize only the phone's location data, which was particularly described in the warrant. In other words, "evidence of first degree intentional homicide" was not the warrant's description of the items to be seized. Thus, this argument, too, was not one that Lichstein should have raised.

In his reply brief, Tate seems to argue that, even if the officers did not obtain a warrant to search for and seize a person or physical items, the Fourth Amendment's particularity requirement was violated because the order authorizing the phone-tracking operation did not specify *both* a place to be searched and a person or thing to be seized. *See Groh v. Ramirez*, 540 U.S. 551, 557 (2004). Here, he seems to argue that because, in his view, the Wisconsin Supreme Court treated the phone's location data as the "place to be searched," such data could not also count as the "thing to be seized." (Reply Br. at 7–11; ECF No. 43.) Therefore, Tate contends, the warrant had to identify something to seize other than location data in order to comply with the second part of the Fourth Amendment's particularity requirement.

The problem with this aspect of Tate's argument is that Lichstein challenged the warrant's failure to satisfy both elements of the particularity requirement on direct appeal and therefore cannot be deemed ineffective for failing to raise this issue. Specifically, Lichstein argued that the particularity requirement required the warrant to specify "both" the "specific evidence" to be seized and a "specific location" to be searched. (ECF No. 35 at 19 of 57 (citing *Groh*, 540 U.S. at 57).) He then argued that although the order authorized "a search for location data," it did not "identify a location where evidence would

13

be found." (*Id.* at 20 of 57.) In other words, Lichstein argued that if the location data was the evidence to be seized,[3] then the warrant was invalid for failing to identify a place to be searched. Tate now argues that the location data was actually a place to be searched and that therefore counsel should have argued that the warrant failed to identify a person or things to be seized. But this is just a different way of saying that the warrant did not specify *both* a place to be searched and a person or thing to be seized, as the Fourth Amendment requires. Lichstein took the more reasonable approach of assuming that location data was the thing to be seized and challenging the order for failing to identify a place to be searched. Tate now takes the approach of describing location data as a place to be searched and contends that the order failed to identify any person or thing to be seized. But these are just two sides of the same coin. The alleged constitutional deficiency was the warrant's failure to specify *both* a place to be searched and a thing to be seized, and the alleged deficiency would exist whether location data is described as a place to be searched or as a thing to be seized.

In any event, even if these are technically different arguments, it is impossible to say that Tate's version is clearly stronger than Lichstein's. Location data is more naturally described as a "thing" to be acquired rather than a place to be searched. *See United States v. Sanchez-Jara*, 889 F.3d 418, 421 (7th Cir. 2018) (describing location data as "the evidence to be acquired"). Thus, the stronger argument was to assume that location data was the thing to be seized and challenge the warrant's failure to specify a place to be searched. That argument did not carry the day in the Wisconsin Supreme Court, and

---

[3] Lichstein also disputed that location data qualified as evidence of a crime, but this aspect of his argument is not relevant here.

14

it has not fared well in federal courts either. *See id.* (rejecting argument that phone-tracking order failed Fourth Amendment's particularity requirement because it allowed agents "to follow the phones wherever they went"); *United States. v. Brewer*, 915 F.3d 408, 414 (7th Cir. 2019) ("Judges must describe the specific person, phone, or vehicle to be tracked to satisfy the Fourth Amendment's particularity requirement. They need not specify (or limit) the tracking to a geographic location."). The courts have concluded that the vice that the particularity requirement of the Fourth Amendment was designed to prevent—the issuance of general warrants that authorize public officials to "rummage where they please in order to see what turns up"—is not present in phone-tracking orders directed at specifically identified phones. *See Sanchez-Jara*, 889 F.3d at 421; *see also Tate*, 357 Wis. 2d at 197 (concluding that "the employment of the electronic serial number for Tate's phone satisfies the particularity requirement because that number permits a particularized collection of cell site information for only one cell phone"). But the fact that this argument failed does not imply that slightly modifying it from challenging the failure to specify a location to the failure to specify a thing improves the argument, much less makes it clearly stronger. Accordingly, Tate has not shown that his appellate counsel rendered ineffective assistance by failing to frame his particularity argument in the way that Tate now frames it.

## B. Failure to Argue that Consent was Tainted

Tate next argues that Lichstein was ineffective in failing to challenge trial counsel's ineffectiveness in not arguing that his mother's consent to the search of her apartment was tainted by what Tate believes was the officers' pre-consent entry into her apartment. As explained in the background section, trial counsel (Attorney Hart) argued at the motion

15

hearing that Cobb never consented to the search at all, but the trial court credited the officers' testimony over Cobb's and found as a fact that she had contented prior to the officers' entry. Tate now argues that Hart should have argued that Cobb actually consented to the search, but only after officers had already entered her apartment. Tate's argument is based on parts of the hearing transcript that, in his view, show that under the officers' own testimony, they must have been inside the apartment before Cobb consented to the search. However, as discussed below, the officers' testimony does not establish that any officer entered the apartment before obtaining Cobb's consent.

Officer Dillman testified that he knocked on Cobb's door and that, when she answered, he asked if he could search the apartment. He testified that she immediately said "come on in" and then escorted him into the apartment. (ECF No. 16-15 at 25 of 106.) Dillman testified that once he entered the apartment, the other officers came in behind him. (*Id.* at 26 of 106.) Dillman did not testify that he or any other officer entered the apartment before he had obtained Cobb's consent.

Officer Enk testified on cross-examination that he entered the apartment after Dillman. He testified as follows regarding his observation of Dillman's interaction with Cobb:

> Q    And did you hear the conversation with Officer Dillman when he went into the apartment to begin with?
>
> A    No.
>
> Q    Where were you when he knocked on the door?
>
> A    In the hallway.
>
> Q    How far away from him?
>
> A    I was outside the apartment building or apartment itself so, I don't know, ten feet, maybe.

16

Q        You didn't hear any of the conversation?

A        No.

Q        So you saw [Dillman] knock on the door; is that correct?

A        Yes.

Q        And did you hear [him] knock on the door?

A        Yes. He was standing in the hallway knocking on the door.

Q        Then what happened?

A        It was opened. He went in and he spoke to somebody inside.

Q        So the door opened and he walked in?

A        He asked to come in, was let in by the—it was a woman who opened the door.

Q        You said he asked to come in?

A        Yes.

Q        So you did hear some conversation?

A         Partially, yes.

(ECF No. 16-15 at 45 of 106.) Enk did not testify that any officer entered the apartment before Dillman. Finally, Officer Juarez testified that the officers did not enter the apartment until after Dillman did. (*Id.* at 54–55 of 106.) She also testified that that Dillman was standing "in the threshold" of Cobb's apartment while he was asking for her consent. (*Id.* at 54 of 106.)

Tate contends that, because Officer Enk initially testified that Dillman "went in" and "spoke to somebody inside" after the door was opened, Dillman must have entered the apartment before obtaining Cobb's consent. However, Enk did not testify that Dillman entered the apartment before obtaining consent. When counsel specifically asked Enk

17

whether Dillman walked in as soon as the door opened, Enk clarified that, when the door opened, Dillman asked to come in.

Tate also contends that Juarez's testimony establishes that Dillman crossed the threshold and entered the apartment before he obtained Cobb's consent. (ECF No. 34 at 37 of 46.) However, that is not a fair reading of the transcript. When Juarez was asked on cross-examination whether Dillman was standing inside or outside the apartment, she answered, "Where a normal person would be talking to somebody like in the threshold, I believe." (ECF No. 16-15 at 54 of 106.) A normal person who knocks on a door and asks permission to enter normally stands on the outside of the threshold while the occupant stands on the inside. Thus, it would be unreasonable to construe Juarez's testimony that Dillman was "in the threshold" as meaning that Dillman had *crossed* the threshold and entered the apartment before obtaining consent.

Tate also contends that the hearing transcript shows that Officers Enk and Juarez must have been in the apartment and searching for "approximately a minute" before Dillman obtained Cobb's consent. (ECF No. 34 at 39 of 46.) However, that is not the case. As discussed above, the officers' aggregate testimony was that Dillman knocked, Cobb answered, Dillman obtained her consent, Dillman entered, and then the remaining officers entered.

In short, because no officer testified that any officer entered the apartment before Dillman obtained consent, Hart could not have performed deficiently by failing to argue that Cobb's consent was tainted by an illegal entry. And because Hart did not render ineffective assistance in this respect, Lichstein could not have rendered ineffective assistance by failing to raise Hart's alleged ineffectiveness as an issue on direct review.

18

*See Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel."). Further, the argument that Lichstein actually raised on appeal—that the tracking order violated the Fourth Amendment and state law—was far stronger than Tate's non-obvious argument that Hart was ineffective in failing to argue that the officers' testimony established that Cobb's consent (which she denied giving) was tainted by an illegal entry. Accordingly, Tate is not entitled to habeas relief on this claim.

## C. Failure to Challenge Plea Colloquy

Finally, Tate argues that Lichstein was ineffective in failing to argue that Hart was ineffective in failing to argue that the trial court accepted Tate's no-contest plea without engaging in a plea colloquy that complied with Wisconsin procedures. The procedures at issue are stated in *State v. Bangert*, 131 Wis. 2d 246, 261–62 (1986), and the parties refer to a failure to follow those procedures as a "*Bangert* violation." *Bangert* states that, as a matter of state law, a trial court accepting a plea of guilty or no contest must make certain inquiries of the defendant during the plea colloquy. *Id.* As is relevant here, *Bangert* requires a state court "[t]o ascertain whether any promises or threats have been made to [the defendant] in connection with his appearance, his refusal of counsel, and his proposed plea of guilty," and "[t]o make sure that the defendant understands that if [he is] a pauper, counsel will be provided at no expense to him." *Id.* at 262.

In the present case, the trial court asked Tate during the plea colloquy whether anyone had "made any threats or in any way forced [him]" to plead no contest. (ECF No. 16-16 at 9–10.) The court also asked him whether anyone had made "any promises" to him other than those reflected in the plea agreement. (*Id.* at 10.) However, the court did

19

not ask Tate specifically whether any promises or threats had been made in connection with his appearance at the plea hearing or his refusal of counsel. Further, the court did not ask Tate whether he understood that if he could not afford counsel, counsel would be provided to him at no expense. Tate did not refuse counsel, and he was represented by appointed counsel at the plea hearing. Nonetheless, Tate contends that the trial court committed *Bangert* violations by not specifically asking him whether threats or promises had been made with respect to his appearance at the hearing and his refusal of counsel and by not confirming that he understood that, if he could not afford counsel, counsel would be appointed at no expense to him. Tate contends that Hart was ineffective in failing to challenge his no-contest plea based on these alleged *Bangert* violations and that Lichstein was ineffective in failing to bring a postconviction motion challenging Hart's ineffectiveness in this regard.

An initial problem with this claim is that Tate does not allege that he ever asked Hart to file a motion to withdraw his plea. A *Bangert* violation is grounds for withdrawing a plea, but it does not *require* that the plea be set aside even if the defendant is satisfied with his plea. *See Bangert*, 131 Wis. 2d at 274 ("Whenever . . . the court-mandated duties are not fulfilled at the plea hearing, the defendant *may* move to withdraw his plea." (Emphasis added)). Thus, even if *Bangert* violations had occurred, unless Hart had some reason to know that Tate wanted to withdraw his no-contest plea, his failure to file a motion to withdraw the plea based on those violations could not have been deficient. Tate does not allege that he formed the desire to withdraw his plea at any time while he was represented by Hart, much less that he conveyed any such desire to Hart during the representation. Likewise, Tate does not allege that he told Lichstein that he told Hart that

20

he wanted to withdraw his plea, and so Lichstein would have had no reason to file a postconviction motion alleging Hart's ineffective assistance in this regard. Thus, even if a clear *Bangert* violation had occurred at the plea hearing, neither Hart nor Lichstein could be deemed ineffective for failing to file a motion that, if granted, would have resulted in the withdrawal of Tate's no-contest plea.

In any event, even if for some reason Hart and Lichstein should have known that Tate wanted to withdraw his plea, Tate would not be entitled to relief on this claim. *Bangert*'s itemized list of topics to discuss during a plea colloquy is not constitutionally mandated. The Constitution requires that a plea be knowing, intelligent, and voluntary. *Boykin v. Alabama*, 395 U.S. 238, 244 (1969). The record must show that the defendant voluntarily relinquished his privilege against self-incrimination, his right to trial by jury, and his right to confront his accusers, *id.* at 242–43; *United States v. Henry*, 933 F.2d 553, 559 (7th Cir. 1991), and that he understood the nature of the charges and the consequences of his plea, *Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002). But beyond these essentials, the Constitution "does not impose strict requirements on the mechanics of plea proceedings." *United States v. Escamilla-Rojas*, 640 F.3d 1055, 1062 (9th Cir. 2011). In the present case, Tate does not allege that the trial court accepted his no-contest plea without complying with aspects of *Bangert* that are constitutionally required. Instead, he alleges that the trial court did not strictly comply with the entire script set out in *Bangert*.

During proceedings on Tate's collateral attack under Wis. Stat. § 974.06, the Wisconsin Court of Appeals determined that Tate had failed to demonstrate that the trial court violated *Bangert*. (ECF No. 16-12 at 9–10.) This conclusion is binding on me, for a

21

federal habeas court may not second-guess a state court's resolution of a question of state law, even when that question arises as part of a federal claim of ineffective assistance of counsel. *See Harper v. Brown*, 865 F.3d 857, 859, 861 (7th Cir. 2017); *Shaw v. Wilson*, 721 F.3d 908, 914 (7th Cir. 2013); *George v. Smith*, 586 F.3d 479, 483–84 (7th Cir. 2009); *Huusko v. Jenkins*, 556 F.3d 633, 637 (7th Cir. 2009); *Earls v. McCaughtry*, 379 F.3d 489, 495 (7th Cir. 2004). Because I am bound by the state court's determination that the trial court committed no *Bangert* violations, I must conclude that Lichstein and Hart did not render ineffective assistance in failing to file motions alleging that such violations occurred.

Tate contends that the Wisconsin Court of Appeals unreasonably determined the facts when it concluded that no *Bangert* violations occurred. But again, a federal court has no authority to review a state-court resolution of a state-law issue, even in the context of a *Strickland* claim. This means that a federal court may not review whether the state court unreasonably determined the facts that pertain to the state-law issue. *See Harper*, 865 F.3d at 861 (noting that federal court assessing *Strickland* claim was bound by state court's determination of an issue of state law even though the habeas petitioner "t[ook] issue with the [state] court's characterization of the facts of his case"). In any event, the facts relevant to the *Bangert* claim were all contained in the transcript of the plea hearing. The Wisconsin Court of Appeals applied *Bangert* to the transcript and determined that the trial court did not omit any required inquiries. This was not an unreasonable determination of the facts. Moreover, Tate's challenge to the state court's decision turns not on the court's determination of the facts, but on its interpretation of *Bangert*. Tate argues that the Wisconsin Court of Appeals wrongly determined that *Bangert* did not require the trial court

22

to specifically ask him if he had received threats or promises with respect to his "appearance at the hearing" or his "decision to forgo an attorney" and that the court's general inquiry into whether he had received any threats or promises was sufficient. (ECF No. 16-12 at 9–10.) Tate also contends that the court misinterpreted *Bangert* in concluding that because Tate was represented by appointed counsel at the plea hearing, the trial court was not required to specifically determine whether he understood that if he was indigent he had a right to appointed counsel. (*Id.* at 10.) Again, because I am bound by the state court's interpretation of *Bangert* whether it was right or wrong, I may not entertain these contentions. Instead, I must assume that any motion to withdraw the plea filed by Hart based on *Bangert*, or any postconviction motion filed by Lichstein alleging Hart's ineffectiveness in failing to file such a motion to withdraw the plea, would have failed. Accordingly, I must conclude that neither Hart nor Lichstein rendered ineffective assistance with respect to the plea. *See Stone*, 86 F.3d at 717 ("Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel.").

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 13th day of May, 2022.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge